FEDERAL DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ROBERT BOWEN,

       Plaintiff,

  -against-

BALDWIN UNION FREE SCHOOL DISTRICT
And the BOARD OF EDUCATION OF THE
BALDWIN UNION FREE SCHOOL DISTRICT,

       Defendants.
-------------------------------------------------------------------X

**SECOND AMENDED
VERIFIED COMPLAINT**

Index No.:15-cv-06829

Jury Trial Demanded on
All Issues

Plaintiff, by his attorneys, Law Offices of Louis D. Stober, Jr., LLC., respectfully alleges:

### PURPOSE OF ACTION

1. Plaintiff commences this action for the purpose of seeking appropriate remedies for his unlawful termination; for Defendants' failure to pay him overtime; and for violations of his due process rights both under federal and state law.

### JURISDICTION AND VENUE

2. Jurisdiction is conferred on the Court by 28 U.S.C. §§ 1331 and 1337 and by 29 U.S.C. § 216. The Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

3. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) and (c) in that the unlawful actions complained of occurred in, and the records relevant to such practices are maintained in this District.

## THE PARTIES

4.  At all times relevant herein, Plaintiff ROBERT BOWEN ("Bowen") is a United States citizen, resident of Nassau County, New York; and at all times relevant herein was an employee of Defendant BALDWIN UNION FREE SCHOOL DISTRICT ("District").

5.  Defendant DISTRICT is a public union free school district existing under the laws of the State of New York, having its office at 960 Hastings Street, Baldwin, NY 11510.

6.  Defendant BOARD OF EDUCATION OF THE BALDWIN UNION FREE SCHOOL DISTRICT ("Board") is the governing body for the District existing under the laws of the State of New York, having its office at 960 Hastings Street, Baldwin, NY 11510.

## PROCEDURAL STATEMENT

7.  New York Education Law § 3813 provides that:

    No action . . . involving the rights or interests of any district . . . shall be prosecuted or maintained against any school district . . . unless it shall appear by and as an allegation in the complaint of necessary moving papers that a written verified claimed upon which such action or special proceeding is founded was presented to the governing body of said district or school within three months after the accrual of such claim, and that the officer or body having the power to adjust or pay said claim has neglected or refused to make an adjustment or payment thereof for thirty days after such presentment.

    N.Y. Educ. Law § 3813 (1) (McKinney 2017).

8.  Generally, a notice of claim will be deemed sufficient where, from the document, the municipal agency is able to identify the place, time and nature of the claim. Atwater v. County of Suffolk, 855 N.Y.S.2d 226, 228 (N.Y. App. Div. 2d Dept. 2002)

9.  Moreover, letters sent by plaintiffs' counsel to defendants detailing the incident have sufficed as a notice of claim. Smith v. Scott, 740 N.Y.S.2d 425, 430 (N.Y. App. Div. 2d Dept. 2002) (plaintiff's letter to defendants sufficed as notice of claim where it contained the plaintiff's name, the nature of the claims, and the time, place and manner in which the

claim arose); <u>Melisi v. C. Sch. Dist. No. 1 of Town of Schoharie, Schoharie County</u>, 266 N.Y.S.2d 933, 935 (N.Y. App. Div. 3d Dept. 1996) (letter sent by plaintiff to defendants apprising defendants of plaintiff's representation in connection with injuries sustained in a bus accident was sufficient notice of claim).

10. On August 4, 2015, Mr. Bowen's counsel sent a letter to defendants which set out in specific detail the time, place and manner of the claims alleged by Mr. Bowen. Annexed hereto as Exhibit A is a copy of the August 4, 2015 letter.

11. The August 4, 2015 letter contains details that would have enabled Defendants to investigate the claims at hand.

12. On October 1, 2015, Mr. Bowen's counsel sent emails to Defendants which state that Plaintiff mailed a "notice of claim/demand letter" in August 2015. Annexed hereto as Exhibit B is a copy of the October 1, 2015 emails.

13. Defendants never responded to Plaintiff's email identifying the letter as a notice of claim to object to such form and thus Defendants have accepted Plaintiff's August 4, 2015 letter as Plaintiff's notice of claim.

14. Additionally, on August 10, 2015, Michelle Gallo, Assistant Superintendent for Human Resources, mailed Mr. Bowen a letter to confirm that Gallo was aware that Mr. Bowen was being represented by counsel regarding this matter. Therefore, Defendants were aware that Mr. Bowen made a timely claim against the District through his August 4, 2015 letter. Annexed hereto as Exhibit C is a copy of the August 10, 2015 letter from Gallo.

15. Moreover, Mr. Bowen's counsel sent a Notice of Claim to Defendants, dated September 29, 2015 and stamped as received by Defendants on October 6, 2015. Annexed hereto as Exhibit D is a copy of the Notice of Claim.

16. Therefore, Mr. Bowen has fully complied with the notice of claim requirement under N.Y. Educ. Law § 3813.

17. Pursuant to the FLSA, a plaintiff may go back three years for a willful violation of the law. 29 U.S.C. § 255 (McKinney 2017).

18. In this action, Defendants have acted willfully to deprive Mr. Bowen of his overtime, thereby trigger the three-year statute of limitations for his FLSA claims.

19. Additionally, under NYLL, there is a six-year statute of limitations.

20. Therefore, Mr. Bowen's FLSA and NYLL unpaid wages claims are valid and are not barred by the statute of limitations.

## **FACTS**

21. In 2000, Mr. Bowen obtained his Bachelors of Science degree from SUNY Farmingdale, in Management of Technology. In 2003 he obtained a Masters Degree from Long Island University CW Post Campus in Information Systems Management.  Additionally, he has taken post-graduate courses from Dowling College to obtain his School District Leader certification. He has taken courses in Educational Administration, Educational Law, Public School Finance and Budget, and Human Resource Management.

22. Beginning in or around February 4, 2002 until on or about July 1, 2015, Bowen was employed by the District.

23. When initially hired, he held the position of a Network Specialist. On or about April 2004 he became the Information Technology Manager.

24. On or about September 9, 2014, Superintendent Camhi met with Mr. Bowen to discuss his subordinates' performance.

25. Bowen provided Superintendent Camhi with the names of the current department employees and a history of staffing issues the department faced.

26. During the September 9, 2014 meeting, Bowen expressed concerns that there was a gap in the skill level of the technicians and specifically referenced two employees by name.

27. Superintendent Camhi replied to Bowen's concerns by stating " it is usually easier to just get rid of the ones with issues."

28. One of the two employees mentioned was Doreen Redman. Bowen stated that Ms. Redman did not always make her best efforts to resolve the simple issues. Superintendent Camhi responded by stating "is she the black one?"

29. Bowen, feeling uneasy with her comment responded and sated " she is the employee who handles Meadow, Lenox and the website."

30. Superintendent Camhi responded "she must be the one who is a resident of Baldwin." Knowing full well that Baldwin is a predominately African American community. At this point her expression change as if she had figured that she in fact was black. She went on to further state that to Bowen "we will have to be creative in finding a way to get rid of her. She will be harder than Mary to get rid of for a few reasons. They like to sue."

31. Our client felt those comments were extremely racist and uncalled for and was shocked that the Superintendent would make such comments.

32. As a result of the uneasiness felt with regards to the September 9, 2014 conversation, Bowen met with Superintendent Camhi on or about September 12, 2014.

33. At this meeting, Bowen expressed to Superintendent Camhi that he felt the comments made about Doreen were inappropriate and he emphasized that he could not and would not participate in coming up with creative ways to terminate Doreen Redman from her employment because she was black.

34. As a result of Bowen's statements, Superintendent Camhi became visibly upset and angry. She responded to Bowen stating "my comments only sound racist to someone who is a racist. I'll get done what needs to be done with or without your cooperation." At that point Bowen, fearful of being retaliated against attempted to change the subject to no avail and the meeting ended.

35. Since expressing his concerns to Superintendent Camhi, Bowen has been berated, yelled at, criticized, scrutinized, subject to a hostile work environment on a daily basis and ultimately replaced by an appointed employee who performs substantially the same duties as our client.

36. One such example of the hostility our client faced occurred on September 16, 2014 when our client was called into a meeting with his direct supervisor, Dr. Seniuk, Assistant Superintendent for Instruction and Superintendent Camhi. During this meeting, Superintendent Camhi aggressively interrogated our client regarding the lack of staffing within the department.

37. The lack of staffing resulted in a backlog of work to accumulate within the Department. After each question, Bowen tried to remain calm and answer, with Dr. Seniuk confirming the answers that were provided were true. Dr. Camhi while acknowledging the response continued to interrogate our client, and ask the same questions again at a later point and continued to subject Bowen to this interrogation for over an hour.

38. After she finished interrogating Bowen, Dr. Camhi began making baseless accusations claiming that Bowen did not have a plan for the Department, and was the reason why "bad workers" were hired. She continued to humiliate Bowen by stating "Do you have ADD, because in my experience technicians have some form of ADD."

39. As this meeting progressed, Superintendent Camhi then questioned why the application "PrintShop" was installed on the computers.  When provided with the explanation that the former Superintendent requested that the application be installed , she responded "Do you know how long PrintShop has been around for? Since 1983. Robert [referencing Bowen] was probably in diapers, and would not remember when it came out."

40. Then Superintendent Camhi began discussing her dislike with the District website's design. After repeatedly being informed that Bowen did not design the website, Dr. Camhi continued to express her disdain.  Finally, Bowen stated " for the hundredth time I did not design the website." Superintendent Camhi responded "I'll slap you if you say something like that again."

41. At the end of the meeting, Superintendent Camhi requested that Dr. Seniuk leave and that Bowen remain. Bowen informed Camhi that he is "not used to being told he will be slapped by a superintendent." She informed Bowen that she was not happy about their previous conversations regarding Doreen Redman and terminating her and informed Bowen that "he wasn't going to make it." She proceeded to inform Bowen of a story of a technician "that never worked in education after she got done with him."

42. Bowen immediately went to Dr. Seniuk's office to request assistance in easing the tension with the Superintendent. Bowen asked Dr. Seniuk "is it just me, or was the entire tone of that meeting wrong?" Dr. Seniuk replied "it was wrong on many, many levels."  He was

then given assurances that Dr. Seniuk would do her best to clear things up with the Superintendent and to ease the tensions However, the work environment continued to grow hostile.  Superintendent Camhi scrutinized and admonished our client unnecessarily for the sole purpose of targeting, discrediting and degrading him.

43.  On September 18, 2014, Superintendent Camhi admonished Bowen for taking a scheduled half day to take his 3 month old son to the doctor for a check up and stated to Bowen "how often do your parental responsibilities interfere with your work?" Our client and Dr. Seniuk explained to her that Bowen rarely left work before 5:30 pm, even though his shift ended at 4 and he was not compensated to work past 4 pm, and around this time of year that he would often work remotely from home until after midnight.

44. On another occasion a few days later, Bowen expressed to Superintendent Camhi that he had been working over 20 days straight, wasn't sleeping, and felt his health was suffering as a result.  While he spoke, she idly stared at her iPhone and callously responded "well, who asked you to?" She then informed our client "you should think of resigning, you aren't going to make it."

45. Superintendent Camhi knew that Bowen had disciplinary protections under the law and was trying to find any excuse to unnecessarily serve him with Section 75 charges and eventually terminate him. She repeatedly would tell Bowen's colleagues that she will serve him with charges and terminate him.

46. This became evident when Superintendent Camhi requested BOCES perform a discovery audit of the department to ensure that the issues which were occurring were not as a result of Bowen's actions. Bowen and Dr. Seniuk explained to Superintendent Camhi that

BOCES had performed an audit 4 months earlier and that the BOCES determined that there were no anomalies at that time.

47. Even though BOCES created a report with their findings, Superintendent Camhi never shared the report with our client or any member of his department.  She never allowed Bowen to respond to any of the "issues" that may have been raised to provide reasonable explanations, and failed to allow Bowen to implement any of their recommendations. Clearly, the only purpose of the report was to justify bringing Bowen on Section 75 charges.

48. Bowen has never seen a copy of this report and since he was never charged with any disciplinary action, always assumed that the findings were not negative and did not place him in a position of fault. However, she ended that meeting by stating, while Dr. Seniuk was out of the room, stated to Bowen "if I were you I would seriously consider resigning." Then, Dr. Seniuk returned to the room, and Superintendent Camhi  said again, " I would seriously consider what we discussed."  She turned to Dr. Seniuk and said "I will explain later."

49. Bowen was distraught from the conversation and shortly thereafter e-mailed Dr. Seniuk explaining that if he was going to resign there should be an exit plan. After the doctor's appointment our client went back to the office and met with Dr. Seniuk. At this meeting, Dr. Seniuk advised our client that she had never been told about the Superintendent requesting our client to resign and assumed the reason our client felt compelled to do so was because of the hostility he continued to face. He was later informed that Superintendent had a meeting with Dominick Labruzzi, the district's IT Specialist II and informed him that Bowen already resigned from his position.

50. When Bowen attempted to speak to the Superintendent regarding the growing hostility, her questions, and how she phrased them, he was told that she'd never said any of that and that he was being "less than honest with her." He stated that Dr. Seniuk was in the room for most of the conversation and that she felt they were out of line. She turned to her computer to read her email and ignored the rest of what he said. The very next day the Superintendent continued to retaliate against Bowen and his staff by suspending all overtime the technology department was allowed to perform, even though, prior to these conversations our client's staff was always able to perform overtime for a period of time before, during and after the opening of school, and there was a need to perform this overtime since 1/3 of the positions in the department were unfilled, or filled with temporary workers that did not have the technical expertise necessary to perform all functions of the position. Thus, without the ability to work overtime the Department would clearly be unable to fulfill its job functions and would fail.

51. Superintendent Camhi continued personally attacking Bowen and expected him to work weekends and not be compensated for his work. She even went so far as to threaten his job security if he refused to work through the weekend without being compensated and claimed on September 19, 2014 that if he "did not have the Industrial Technology Computer lab up and running by Monday morning" he "could just go right to HR and hand in his phone, ID, and keys."

52. During at least one faculty meeting at Meadow Elementary, which she attended to introduce herself to the staff she stated in front of the entire faculty and building administrators, "heads are going to roll in Technology." She insulted Bowen in front of teachers, administrators, clerical workers, and support staff often stating "My husband is

in IT and I know all IT people are full of shit." She attempted to undermine our client's authority by having technicians from BOCES come in to help with the backlog of tickets, yet only one tech appeared for duty for two days, and instead of reporting to our client, he reported to his boss and was thus clueless as to where to go and what tasks to perform.

53. When Bowen raised this issue with Dr. Seniuk a few weeks later, a second individual came, worked for two days and left as well. Superintendent Camhi has criticized our client for performing tasks that he was directed to perform and for ordering equipment he was directed to order by previous administrators while they supervised the district. She continued to make inflammatory comments to the staff and teachers and used our client as a scapegoat. She enforced policies whereby the staff would have to report any issues directly to her rather than through the helpdesk ticket system, and would withhold the information from the Technology Department thus, those issues went unaddressed. This was all done in an attempt to find reasons and justifications to terminate Bowen.

54. The harassment continued beyond the working day, as Bowen received frequent emails outside of working hours and would be admonished if they were not immediately responded to, even though he was not paid to be on standby or address her concerns after working hours.  She continued to find any alleged mistake or error and would attempt to blame Bowen for the mistake. When her attempts in finding a reason to charge Bowen failed, she began withholding information and would tell  employees that she was going to "Section 75" our client.

55. Due to the hostile work environment Bowen suffered from extreme emotional distress, experienced fragmented sleep, lack of appetite and was constantly anxious because he was

fearful of losing his job, especially when he heard from others that she was looking to "Section 75" him.

56. Despite the frequent ridicule, harassment, and denial of resources, under Bowen's leadership the Technology Department had its best school year since the staffing issues began in 2009. Their uptime averaged at 99.97%, which is higher than some corporations such as Google's gmail.com and Microsoft's Office 365 attained over the same time period. Users only had good things to say when asked, though many mentioned feeling bad that Bowen's department was so severely short staffed. Bowen attempted to move forward, and continued to discuss ways to improve the image of the Department. Dr. Seniuk noted how impressive it was that things were running so well and she would try to figure out a way to have more direct free flow of information between the staff and the Department. However, this never occurred.

57. Bowen was proactive and in May of 2014,  upon the recommendation of Jim Scannell, compiled a list of items that were needed to maintain a stable network. Purchase orders were created that June but our client was informed that he had to wait for the incoming Superintendent, Dr. Camhi's input before sending them out. Even though Jim Scannell and Dr. Camhi met to discuss these issues, they never discussed the purchase orders.  In early August, Jim Scannell suggested that Bowen contact Dr. Camhi and inquire directly as to the status of the purchase orders.  Initially, she approved the orders and some items were ordered and installed.  However, with the understanding that this equipment was required and plans were in place to install it over the Thanksgiving break, without any notice she instructed the business office to cancel the purchase orders and asked that any items that were already received be returned.

58. When Bowen raised this concern with Dr. Seniuk and stated it would cause issues because we wouldn't have the equipment to finish the projects, the only response Bowen received was "its just the way it is, just keep a record of it to protect yourself."

59. Fearing that Superintendent Camhi would attempt to conduct a Section 75 hearing based on false information, Bowen began to record conversations with Superintendent Camhi and Dr. Seniuk wherever possible. Dr. Seniuk only spoke positively about Bowen and Bowen felt recordings would assist him in disputing any false charges. given the Superintendent's retaliatory, callous, and vindictive behavior towards him.

60. Dr. Seniuk is listed as one of the Dignity Act Coordinators for the district as per the "Project SAVE – Code of Conduct" document posted on the district's website.  This policy states the "**Dignity Act Coordinator (DAC): The DAC is expected to:** Address issues of discrimination, harassment and bullying, or any situation that threatens the emotional or physical health or safety of any student, school employee or any person who is lawfully on school property or at a school function."

61. Transcripts of conversations between Bowen and Dr. Seniuk contain multiple instances of Bowen reporting Superintendent Camhi's behavior and actions. Rather than address these issues and take action to stop them, when Bowen reported these issues he was being personally targeted by Superintendent Camhi for objecting to things she said, he was told "It's where we are at" and his concerns went unaddressed.

62. On another occasion when Bowen reported that the morale of the department was deteriorating and that we felt as if work we had done was unraveling, Dr. Seniuk responded and stated "Let it go, just email me what's been unraveling, and don't let it get to you."

Bowen's voice broke and stated "It already has." Dr. Seniuk responded by saying "I know but try…there's nothing you can do."

63. During the 2014-15 school year, there were no widespread issues, slowdowns, inability to access data/email. There were a handful of minor issues, all of which would have been prevented if the orders had actually been made and proper staff levels were maintained. Bowen even had teachers, who were habitual complainers, approach him and commend him on how well things were working and happy they were.

64. Bowen worked tirelessly and endlessly to ensure the Department was running properly, even with the Superintendent's attempts to sabotage and create a facade as if the Department was being mismanaged. He worked emergency overtime, as was required of him fearing that any minor system failure would result in further berating and section 75 charges, but was never compensated.   Approximately a month before Bowen's position was unlawfully abolished, he complained to Dr. Seniuk about how often he'd spend weekends working and explained he believed it was a violation of law not to have been paid for the emergency overtime that was required of him to perform and he would file a complaint with the Department of Labor.

65.  When the Superintendent's efforts to find a reason to serve our client with Section 75 charges that justified a penalty of termination failed, she abolished his position to retaliate against our client for failing to cooperate with her plan to terminate a minority employee because she was black and because he threatened to file a complaint with the Department of Labor for the District's failure to pay him for the overtime he worked.

66. On July 1, 2015 our client's position was illegally abolished.

67. On July 1, 2015 the Board passed a resolution to hire Bowen's replacement.

68. On July 2, 2015, Mr. Bowen was called into a meeting with Dr. Seniuk and Gallo. Gallo and Dr. Seniuk notified Mr. Bowen that his position had been abolished at the July 1, 2015 Board meeting and his employment was being terminated effective immediately.

69. During the July 2, 2015 meeting, Mr. Bowen expressed that he believed his termination was an illegal action and was told by Gallo that the Board had already voted and that there was no recourse.

70. Upon information and belief, the position was not abolished due to economic reasons and it was not due to an abolition of functions.

71. Throughout his entire tenure with the District, Bowen was never spoken to with regards to his performance and he was never served with any type of disciplinary action. He consistently received outstanding performance evaluations and worked extremely hard to perform his duties and fix the issues that were known to him, and run the department as efficiently as possible given the limited staffing and the hostility he faced from the Superintendent.

72. Bowen's position is a competitive class position. Under Article 5 Section 6 of the New York State Constitution "Appointments and promotions in the civil service of the state and all of the civil divisions thereof, including cities and villages, shall be made according to merit and fitness to be ascertained, as far as practicable, by examination which, as far as practicable, shall be competitive."

73. A FOIL request was made on July 8, 2015 requesting the following information : "Under the New York Freedom of Information Law, N.Y. Pub. Off. Law sec. 84 et seq., I am requesting an opportunity to inspect or obtain copies of public records:

Job descriptions, interview information, hiring/starting date(s), and budget information reflecting these titles appeared in the budget that was passed for the

2015/2016 fiscal year. If these titles **were promotions or replaced existing titles, please provide the name(s) of the title(s) that they replaced and the staff member(s) name(s)/previous title(s). If they replace staff that are no longer employed, please provide their name(s) and title(s).**
**Titles: Instructional Technology/CTP, Director. (Emphasis added).**

67. In response to this request, the District sent a letter dated July 20, 2015 stating that the Board approved a probationary appointment of Darren Faccilonga as Director of Technology to replace Bowen. (Ex. E, true and accurate copy of the letter).  The letter was accompanied by the Personnel Actions Report addendum showing the abolishment of the Information Technology Manager position and the job description for the position. (Ex. F, true and accurate copy of the job description received).

68. Upon information and belief, Darren Faccilonga is performing Mr. Bowen's job functions under the guise of a newly created title of "Director of Technology and Technology Community Partnerships."

69. Mr. Faccilonga's position is a non-competitive position, thus his appointment was not based on merit and fitness ascertained by examination as required by the New York State Constitution and would constitute a violation of Section 6.

70.  All these duties were performed previously by Mr. Bowen.

71. Further, under the Civil Service Law, the District can only abolish a position due to economy or abolition of functions. By the District's own admission, our client was replaced by an exempt employee, who is earning a substantially greater salary than our client. Our client's job functions are being performed by the exempt employee and have not been abolished. Under the Civil Service Law, an exempt employee may not replace the job functions of a competitive class employee, thus, making the abolishment of his position illegal.

72. Furthermore, the animosity towards Bowen because of his refusal to join in on the Superintendent's discriminatory scheme of coming up with "creative ways" to terminate a black employee became clear to our client when he was subject to constant harassment, ridicule, degradation in front of his staff, co-workers, administrators and teachers on a daily basis. The Superintendent made it clear to Bowen that his contributions and skills would not be utilized by the District because he refused to act in a discriminatory manner and because he complained of violations of the New York State Labor laws.

73. Mr. Bowen informed Dr. Seniuk that he will file a claim with the Department of Labor for the District's failure to pay him overtime that he earned.

74. Approximately one month after informing Dr. Seniuk, Mr. Bowen's position was abolished.

75. Defendants acted in bad faith and in an effort to circumvent the Civil Service Law by abolishing Bowen's position and failing to give him any notice or due process regarding same.

76. On February 25, 2016 our client appeared for an examination under General Municipal Law § 50-h.

77. During his employment with the District, Mr. Bowen worked a regular work week of 35-hours per week.

78. During his employment with the District, Mr. Bowen's regularly scheduled work hours were from 8:00AM until 4:00P with a one hour break for lunch.

79. In addition to his regular 35-hour work week, Mr. Bowen regularly worked 40 hours per week and also in excess of the 40 hours Mr. Bowen worked overtime which he was not compensated for, including but not limited to, Mr. Bowen working both before and after

his scheduled start and end time, working through lunch, on holidays and weekends, during paid time off, and Mr. Bowen working for 20 straight days without a day off.

80. Mr. Bowen notified the District of their failure to pay him for the overtime he was mandated to work contemporaneously as he earned the overtime.

81. Dr. Seniuk confirmed receiving Mr. Bowen's overtime slips and on several occasions discussed with Mr. Bowen the amount of extra time that he was working on.

82. Dr. Seniuk assured Mr. Bowen that she would try to get Mr. Bowen compensated for the overtime that he worked.

83. However, the District failed to compensate Mr. Bowen for the overtime hours he worked.

84. On or about November 2, 2015, a Petition on behalf of Mr. Bowen was filed. Subsequently thereafter, Defendants removed the Action from the Supreme Court of the State of New York, Nassau County.

## COUNT I

## VIOLATION OF CIVIL SERVICE LAW SECTION 80

85. Plaintiff repeats and re-alleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

86. Plaintiff is covered by the protections in Civil Service Law section 80.

87. Civil service positions may be abolished in the interest of economy as long as such abolishment is not the result of "bad faith, fraud, or collusion." *Piekielniak v. Axelrod*, 92 A.D.2d 968, 969 (3rd Dept. 1983).   Abolishment of a civil service position must be undertaken in good faith, and cannot be a mere subterfuge or false explanation offered to conceal a real purpose of removing a troublesome employee or avoiding compliance with the Civil Service Law. *Rosenthal v. Gilroy*, 208 A.D.2d 748 (2d Dept. 1994); *Terrible v.*

*County of Rockland*, 81 A.D.2d 837, 838 (2nd Dept. 1981). A full hearing must be held for any questions of fact. *Rosenthal*, 208 A.D.2d at 748; *Terrible*, 81 A.D.2d at 838.

88. The Defendants did not abolish Bowen's position in good faith or for economic reasons and instead used it as a subterfuge to hide their discriminatory and retaliatory motives.

89. Upon information and belief, Mr. Faccilonga is performing Mr. Bowen's duties and has replaced Mr. Bowen.

90. Pursuant to Section 81 of the Civil Service Law, the District must place the petitioners on a preferred list for any "same, similar or comparable" positions, for preference in rehiring.

91. To date, the Defendants have failed to place Mr. Bowen on a preferred list for his respective title.

92. The Defendants failure to create a preferred list for the Plaintiff and the failure to appoint the Plaintiff to the same, similar or comparable position is in violation of Section 80 of the Civil Service Law.

93.  The position of "Director of Technology and Technology Community Partnerships" must be considered the same, similar or comparable to the position held by Mr. Bowen, as Information Technology Manager.

94. Upon information and belief, the position was created for the sole purpose of excising Mr. Bowen. The job specifications for the position of  "Director of Technology and Technology Community Partnerships"  are generic and overly broad. (Ex. F, a true and accurate copy of the Job Specifications).

95. In fact, a Google search revealed it was composed- almost verbatim - from a NETS Technology Director profile. (Ex. G, a true and accurate copy of the NETS profile).

96. Mr. Bowen performed substantially all of the job duties that Defendants listed in Faccilonga's job specifications, including but not limited to working with faculty/staff to identify and implement technology based resources to improve instruction. Using current and future resources to continue to advance the technical infrastructure and improve the learning environment. Developing and maintaining collaborative systems to enhance instruction and communication with internal and external users. Hiring, organizing and supervising, and evaluating qualified technology staff to maintain and expand the technology infrastructure. Designing and delivering staff development to users to support instruction and new initiatives. Researching, designing and implementing distance learning programs to expand offerings. Working with Administration to develop, communicate and implement technology innovations. He researched and recommended technology resources and recommending purchases for hardware/software/services.

97. By creating a new position to perform the duties of an Information Technology Manager, the defendants have engaged in a bad faith layoff since the position of Information Technology Manager has not, in reality, been abolished since the duties of that position are still being performed.

98. Further, the position of "Network Specialist" and/or "Network Specialist/Information Technology Specialist" is a competitive class position within the same promotional line as Information Technology Manager and is deemed a comparable position. The District has two as openings for Network Specialists and they failed to afford Mr. Bowen the right to fill that position.

99. Defendants violated section 80 through their unlawful abolishment of Bowen's position and their failure to afford him the opportunity to fill or replace one of the Information Technology Specialist positions and the failure to place him on a preferred list.

## COUNT II
### (Overtime Violations under FLSA)

100. Plaintiff repeats and re-alleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

101. Defendants knowingly, willfully, and intentionally failed to pay overtime pay at a rate one and one-half times the regular rate for hours worked in excess of forty (40) hours per week, in violation of 29 U.S.C. § 207(a)(1).

102. Due to Defendants' willful violation of the FLSA, Bowen is entitled to recover from Defendants unpaid overtime compensation, and an equal amount in the form of liquidated damages, as well as reasonable attorney's fees and costs of the action, including pre-judgment interest, pursuant to the FLSA, all in the amount to be determined at trial.

## COUNT III
### (Overtime Violations under New York Labor Law)

103. Plaintiff repeats and re-alleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

104. Labor Law § 663 authorizes a civil action for overtime wages in accordance with Labor Law regulation 12 NYCRR 142–2.2.

105. Defendants' knowingly, willfully, and intentionally failed to pay overtime pay at a rate one and one-half times the regular rate for hours worked in excess of forty (40) hours

per week in accordance with New York State Labor Law's overtime regulation, 12 NYCRR 142–2.2.

106. Due to Defendants' willful violation of NYLL and supporting regulations, Bowen is entitled to recover from Defendants unpaid overtime compensation, and an equal amount in the form of liquidated damages, as well as reasonable attorney's fees and costs of the action, including pre-judgment interest, pursuant to NYLL, all in the amount to be determined at trial.

## <u>COUNT IV</u>
## <u>(Failure to Pay Earned Compensation under NYLL)</u>

107. Plaintiff repeats and re-alleges each and every allegation set forth in the paragraphs above as if fully set forth herein.

108. Labor Law § 663 authorizes a civil action to recover monies for the employer's intentional withholding of earned compensation.

109. Defendants' willfully withheld from Bowen earned compensation, in violation of NYLL § 198(1-a).

110. Moreover, under NYLL, Mr. Bowen is entitled to his unpaid gap-time hours worked by the District.

111. Mr. Bowen is entitled to recover from Defendants the uncompensated gap-time hours that Mr. Bowen worked between his regular 35-hour workweek and the statutory 40-hour workweek.

112. Bowen is entitled to recover from Defendants damages in accordance with NYLL § 198(1-a), in the amount of the unpaid compensation as well as reasonable attorney's fees and costs of the action, including pre-judgment interest, pursuant to NYLL, all in the amount to be determined at trial.

## COUNT V
## VIOLATION OF 42 U.S.C. § 1983

113. Plaintiff repeats and re-alleges each and every allegation set forth in the paragraphs above, as if fully set forth herein.

114. Plaintiff is within the protections afforded by 42 U.S.C. § 1983.

115. Acting under color of state law and in concert with one another, Defendants denied Bowen his rights, privileges, and unity secured to him under the United States Constitution by depriving him of due process prior to termination.

116. As a result of Defendants' acts, Plaintiff has suffered and is entitled to damages sustained to date and continuing, together with interest, attorney's fees pursuant to 42 U.S.C. § 1988, and costs of this action.

117. No prior application for the relief sought in this petition has been made to this or any other court.

**WHEREFORE**, Plaintiff demands judgment against the Defendants on all Counts as follows:

(a)     Declaring that the allegations set forth against the Defendants in this Complaint are unlawful and in violation of Civil Service Law sections 80;

(b)     Declaring that the allegations set forth against the Defendants in this Complaint are unlawful and in violation of the Fair Labor Standards Act;

(c)     Declaring that the allegations set forth against the Defendants in this Complaint are unlawful and in violation of New York Labor Law;

(d)     Declaring that the allegations set forth against the Defendants in this Complaint are unlawful and in violation of 42 U.S.C. § 1983;

(e)      Permanently enjoining the Defendants, their agents, officers and employees from engaging in all practices found by this Court to be in violation of the statutes set forth herein and from interfering with Plaintiff Bowen's lawful employment with the District;

(f)      Ordering Defendants to reinstate Plaintiff Bowen to his former position with the District, with back pay and all other emoluments of employment, including leave entitlements, which he would have received if not wrongfully denied reinstatement, together with interest thereon from the date of denial to the actual date of reinstatement, at a rate of 9% interest thereon;

(g)      Awarding Plaintiff reasonable attorneys' fees and all other costs, disbursements and expenses of this action; and

(h)      Allowing Plaintiff such other and further relief as may be just, proper and equitable.

Dated: Mineola, NY
          September 26, 2017

Louis D. Stober, Jr. (LS9318)
Law Offices of Louis D. Stober, Jr, LLC
Attorneys for Plaintiff
98 Front Street
Mineola, NY  11501
(516) 742-6546

## VERIFICATION

STATE OF NEW YORK    )
                           : SS.:
COUNTY OF NASSAU    )

    ROBERT BOWEN, being duly sworn says:

    I am the Plaintiff in this proceeding.  I have read the annexed SECOND AMENDED VERIFIED COMPLAINT, know the contents thereof, and the same is true to my knowledge, except those matters therein which are stated to be alleged on information and belief, and as to those matters, I believe them to be true.

                                                           _____
                                                          ROBERT BOWEN

Sworn to this 26 day of September, 2017

_____
NOTARY PUBLIC

LOUIS D. STOBER
Notary Public, State of New York
No. 02ST4822083
Qualified in Nassau County
Commission Expires Oct. 31, 20 18

FEDERAL DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
ROBERT BOWEN,

                    Plaintiff,

             -against-

BALDWIN UNION FREE SCHOOL DISTRICT
And the BOARD OF EDUCATION OF THE
BALDWIN UNION FREE SCHOOL DISTRICT,

                    Defendants.
-------------------------------------------------------------------X

Index No.:15-cv-06829

Jury Trial Demanded on
All Issues

---

## SECOND AMENDED VERIFIED COMPLAINT

---

**Law Offices of**
**LOUIS D. STOBER, JR., LLC**
**By: Louis D. Stober, Jr., Esq.**
**98 Front Street**
**Mineola, NY 11501**
**(516) 742-6545**
**(516) 742-8603 – Fax**